Martin A Muckleroy
Nevada Bar No. 1394
**MUCKLEROY LUNT**
6077 S. Fort Apache Rd., Ste 140
Las Vegas, Nevada 89148
Tel:    (702) 907-0097
Fax:    (702) 938-4065
Email: martin@muckleroylunt.com

*Liaison Counsel for Plaintiffs*

[Additional counsel appear on signature page]

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

|  |  |
|---|---|
| ROBERT OHIGASHI, on Behalf of Himself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| PINNACLE ENTERTAINMENT, INC., ANTHONY M. SANFILIPPO, CARLOS RUISANCHEZ, CHARLES L. ATWOOD, STEPHEN COMER, RON HUBERMAN, JAMES L. MARTINEAU, JAYNIE MILLER STUDENMUND, and DESIRÉE ROGERS | JURY TRIAL DEMANDED |
| Defendants. |  |

Plaintiff Robert Ohigashi ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Class Action Complaint:

### NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Pinnacle Entertainment, Inc. ("Pinnacle" or the "Company")

against Pinnacle and the members of Pinnacle's Board of Directors (the "Board" or the "Individual Defendants," and together with Pinnacle, "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 and Regulation G, 17 C.F.R. § 244.100, and to enjoin the vote on a proposed transaction, pursuant to which Pinnacle will be acquired by Penn National Gaming, Inc. ("Parent"), through its wholly-owned subsidiary Franchise  Merger Sub, Inc. ("Merger Sub," and together with Parent, "Penn") (the "Proposed Transaction").

2.      On December 18, 2017, Pinnacle and Penn issued a joint press release announcing they had entered into an Agreement and Plan of Merger dated December 17, 2017 (the "Merger Agreement"), pursuant to which each outstanding share of Pinnacle will be converted into the right to receive 0.42 shares of Penn common stock and $20.00 in cash (the "Merger Consideration").  Pursuant to the Merger Agreement, Merger Sub will merge with and into the Company, with the Company surviving the merger.  Based on Penn's closing price on December 15, 2017, the Merger Consideration implied a total purchase price of $32.47 per Pinnacle share.  However, based on Penn's closing price on February 27, 2018 of $26.35, the implied value of the Merger Consideration declined to $31.07.  If the Proposed Transaction is consummated, Penn shareholders will hold approximately 78% of the combined company, while former Pinnacle stockholders will hold approximately 22%.   The Proposed Transaction is valued at approximately $2.8 billion.

3.      In connection with the Proposed Transaction, Penn has entered into an agreement with Boyd Gaming Corporation ("Boyd"), pursuant to which Boyd will purchase Pinnacle's gaming operations at Ameristar Kansas City and Ameristar St. Charles in Missouri, Belterra Casino Resort in Indiana, and Belterra Park in Ohio, for approximately $575 million in cash.

4.     On February 28, 2018, Defendants filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC in connection with the Proposed Transaction that set the stockholder vote date for March 29, 2018.  The Proxy Statement, which recommends that Pinnacle stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Pinnacle's financial projections, relied upon by Pinnacle's financial advisor J.P. Morgan Securities LLC ("J.P. Morgan") in its financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; (iii) Pinnacle insiders' potential conflicts of interest; and (iv) the background process leading to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act, as Pinnacle stockholders need such information to cast a fully-informed vote in connection with the Proposed Transaction or seek appraisal.

5.     In short, unless remedied, Pinnacle's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an

individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, most of the documents are electronically stored, and the evidence exists.  Pinnacle's corporate headquarters is located in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

**THE PARTIES**

9.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Pinnacle.

10.      Defendant Pinnacle is a Delaware corporation with its principal executive offices located at 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169.  Pinnacle owns and operates 16 gaming, hospitality, and entertainment businesses.  The Company's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "PNK."

11.      Defendant Anthony M. Sanfilippo ("Sanfilippo") has served as Chairman of the Board since May 2010 and as Chief Executive Officer ("CEO") of the Company since 2010.

12.      Defendant Carlos Ruisanchez ("Ruisanchez") has served as President of the Company since 2013, Chief Financial Officer since 2011, and as a director since May 2016.

13.      Defendant Charles L. Atwood ("Atwood") has served as a director of the Company since 2015.  Atwood is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

14.      Defendant Stephen Comer ("Comer") has served as a director of the Company since 2015.  Comer is the Chair of the Audit Committee and a member of the Compensation Committee.

15.     Defendant Ron Huberman ("Huberman") has served as a director of the Company since 2017.  Huberman is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

16.     Defendant James L. Martineau ("Martineau") has served as a director of the Company and as Non-Executive Chairman since 2016.  Martineau served as a director of Pinnacle's predecessor ("Former Pinnacle") from 1999 through 2016.

17.     Defendant Jaynie Miller Studenmund ("Studenmund") has served as a director of the Company since 2016, and was a director of Former Pinnacle from 2012 through 2016. Studenmund is Chair of the Compensation Committee and a member of the Compliance Committee.

18.     Defendant Desirée Rogers ("Rogers") has served as a director of the Company since 2016, and was a director of Former Pinnacle from 2012 through 2016.  Rogers is a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

19.     Defendants Sanfilippo, Ruisanchez, Atwood, Comer, Huberman, Martineau, Studenmund, and Rogers are collectively referred to herein as the "Individual Defendants" or the "Board" and, together with Pinnacle, "Defendants."

**OTHER RELEVANT ENTITIES**

20.     Penn is a Pennsylvania corporation with its headquarters located at 825 Berkshire Blvd., Suite 200, Wyomissing, Pennsylvania 19610.  Penn was incorporated in 1982 as PNRC Corp. and adopted its current name in 1994.  Penn is the owner and manager of gaming and racing facilities and video gaming terminal operations, and as of December 31, 2017, it owned, managed, or had ownership interests in 29 facilities in 17 jurisdictions.  Penn's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "PENN."

21.     Merger Sub is a wholly owned subsidiary of Penn that was formed solely for the purpose of effectuating the Proposed Transaction, and is a party to the Merger Agreement.

22.    Boyd is a Nevada corporation that owns and operates 24 gaming entertainment properties in Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana and Mississippi.   Boyd's common stock is traded on the New York Stock Exchange under the ticker symbol "BYD."

23.    Gaming and Leisure Properties, Inc. ("GLPI") is a Pennsylvania corporation engaged in the business of acquiring, financing, and owning real estate.   It became a separate entity in November 2013, when Penn separated its real property from its gaming operations, which it accomplished by spinning-off GLPI.   Currently, both Pinnacle and Penn lease a majority of the real estate associated with their properties from GLPI under a master lease.   Peter Carlino is the chairman of Penn's board of directors, and is also the CEO of GLPI and the chairman of the GLPI board.

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Pinnacle common stock (the "Class").   Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

25.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.    The Class is so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.   As of February 27, 2018, there were 58,133,737 shares of Company common stock issued and outstanding held by individuals and entities who are geographically dispersed.   All members of the Class may be identified from records maintained by Pinnacle or its transfer agent and may be

notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

27.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)    Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 and Regulation G promulgated thereunder;

(b)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

28.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background

31.    Pinnacle was founded in 1938, and began as a horse racing business that eventually evolved into a casino business.  Today, the Company operates 16 gaming, hospitality, and entertainment business, of which 15 operate in leased facilities.  Pinnacle's owned facilities are located in Ohio, while its leased properties are located in Colorado, Indiana, Iowa, Louisiana,

Mississippi, Missouri, Nevada, and Pennsylvania. The Company's leased properties are subject to a master lease with GLPI, as described herein.

32.    In April 2016, Former Pinnacle (*i.e.*, Pinnacle Entertainment, Inc. prior to the spin-off and merger with GLPI) completed transactions under a merger agreement with GLPI, whereby Former Pinnacle separated its operating assets and liabilities (and its Belterra Park property and excess land at certain locations) into the Company, a newly formed subsidiary initially named PNK Entertainment, Inc., and distributed to its stockholders, on a pro rata basis, all of the issued and outstanding shares of common stock of the Company. Gold Merger Sub, LLC ("Gold"), a wholly owned subsidiary of GLPI, then merged with and into Former Pinnacle, with Gold surviving the merger as a wholly owned subsidiary of GLPI. Following the merger, the Company was renamed Pinnacle Entertainment, Inc., and now operates 14 of its gaming, hospitality, and entertainment businesses under a triple-net master lease agreement for the facilities acquired by GLPI.

33.    Pinnacle grew its operations through a series of strategic acquisitions, including the August 2013 acquisition of Ameristar Casinos, Inc. and the September 2016 acquisition of The Meadows Racetrack and Casino in Washington, Pennsylvania (the "Meadows"). Pinnacle owns and operates the Meadows' gaming, entertainment, and harness racing business subject to the master lease with GLPI.

**The Sale Process**

34.    The sale process that would eventually culminate in the Proposed Transaction began in December 2016, when the Board discussed the possibility of pursuing a potential acquisition of Penn, and approached GLPI, in its capacity as the landlord under the Pinnacle master lease and the Penn master lease. On February 16, 2017, Pinnacle sent a proposal to Penn for Pinnacle to acquire Penn for $18.00 per share in cash. The Penn board of directors

determined to explore alternatives to Pinnacle's offer, including a potential acquisition of Pinnacle by Penn.

35.     To that end, Penn began discussions with Boyd to assess its interest in participating as a divestiture buyer if Penn were to pursue an acquisition of Pinnacle.

36.     On March 15, 2017, Penn delivered a letter to Pinnacle rejecting its proposal and another letter proposing to acquire Pinnacle for $23.00 per share in cash.  Over the next few weeks, the Board discussed Penn's proposal with management and its advisors, and posed certain questions to Penn regarding its proposal.

37.     On April 4, 2017, the Board met to discuss Penn's proposal.  Subsequently, Pinnacle sent a letter to Penn rejecting the proposal but stating that it would be willing to engage in negotiations for the price of $28.50 per share in cash.  .

38.     At a May 1, 2017 Board meeting, the Board discussed the possibility of contacting other parties to explore their interest in a potential transaction but determined not to do so at that time.

39.     On May 5, 2017, Penn delivered a revised proposal to Pinnacle reflecting a $25.00 per share all-cash transaction.

40.     On May 31, 2017, Penn communicated to Pinnacle that it would not be in a position to submit a revised proposal to Pinnacle until Penn better understood the key economic terms of the divestiture transaction with Boyd and a transaction with GLPI.  On June 12, 2017, the Board met and instructed management to move forward with considering other transactions.

41.     On July 21, 2017, Penn sent a revised proposal letter to Pinnacle for the price of $25.50 per share in cash.  The parties ceased discussion of a potential transaction on August 11, 2017.

42.     Negotiations resumed in early October 2017 when Penn contacted Pinnacle to determine if it would be open to an acquisition for a combination of cash and Penn stock.  On October 25, 2017, Penn sent a letter proposal consisting of $19.00 in cash, 0.393 shares of Penn common stock, and contingent consideration based on the value of certain of Pinnacle's non-core assets that would be realized upon a sale to a third party.  The Board met to consider this proposal on October 29, 2018, and determined not to respond to Penn, but that management should proceed with a meeting with Penn on November 1, 2017.

43.     Following negotiations between the parties, on November 14, 2017, the Board authorized management to pursue the negotiation of a definitive agreement with Penn based on the terms of $20.00 in cash and 0.42 shares of Penn stock.  For the next month, Pinnacle, Penn, and their advisors negotiated the terms of the Proposed Transaction, including open terms in the Merger Agreement and the divestiture agreement.

44.     On December 17, 2017, the Board met to consider the final terms of the Merger Agreement.  J.P. Morgan discussed its financial analyses regarding the Proposed Transaction and provided its written fairness opinion and the Board adopted, approved, and declared advisable the Merger Agreement and Proposed Transaction.  The parties executed the Merger Agreement that same day.

**The Proposed Transaction**

45.     On December 18, 2017, Pinnacle and Penn issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

WYOMISSING, Pa. & LAS VEGAS--Penn National Gaming, Inc. (NASDAQ: PENN) ("Penn National") and Pinnacle Entertainment, Inc. (NASDAQ: PNK) ("Pinnacle") announced today that they have entered into a definitive agreement under which Penn National will acquire Pinnacle in a cash and stock transaction valued at approximately $2.8 billion.  Under the terms of the agreement, Pinnacle shareholders will receive $20.00 in cash and 0.42 shares of Penn National common stock for each Pinnacle share, which implies a total purchase price of $32.47 per Pinnacle share based on Penn National's closing price on December 15, 2017.  The transaction reflects a 36% premium for Pinnacle shareholders

based on Pinnacle's closing price of $21.86 and Penn National's closing price of $22.91 on October 4, 2017.  The transaction has been approved by the boards of directors of both companies and is expected to close in the second half of 2018.

Pinnacle owns and operates 16 gaming and entertainment facilities in 11 jurisdictions across the United States.  Following the acquisition of Pinnacle and the planned divestiture of four of its properties to Boyd Gaming Corporation (NYSE: BYD) ("Boyd") (as described below), Penn National will have significantly greater operational and geographic diversity and operate a combined 41 properties in 20 jurisdictions throughout North America.  The transaction is expected to generate $100 million in annual run-rate cost synergies following integration and is anticipated to be immediately accretive to free cash flow in the first year. Pro forma for the divestitures and synergies, the acquisition reflects a multiple of 6.6x LTM EBITDA.

Timothy J. Wilmott, Chief Executive Officer of Penn National Gaming, commented, "By combining our highly complementary portfolios and similar operating philosophies, we will be able to leverage the strengths of both our companies and create an unparalleled experience for our regional gaming customers, while generating significant value for our shareholders and business partners."

Mr. Wilmott continued, "The combined company will benefit from enhanced scale, additional growth opportunities and best-in-class operations, creating a more efficient integrated gaming company.  Going forward, we will have the financial and operational flexibility to further execute on our strategic objectives, while maintaining our track record of industry-leading profit margins and generating significant cash flow to reduce leverage over time.  We look forward to welcoming Pinnacle's talented employees to our team and to further enhancing our status as North America's leading regional gaming operator."

Anthony Sanfilippo, Chairman and Chief Executive Officer of Pinnacle Entertainment, said, "Pinnacle is a terrific company whose success is due to the efforts of our more than 16,000 team members that focus every day on providing great service and memorable experiences for our guests.  Tim and the Penn National team lead a high-quality organization that, like Pinnacle, has a long track record of operational excellence and accretive growth.  We believe the combination will produce an even stronger gaming entertainment platform that builds on the individual accomplishments of both companies and benefits our collective team members, shareholders and guests."

Mr. Sanfilippo continued, "Pinnacle shareholders will receive immediate value from the cash consideration, as well as participation in the longer-term growth of Penn National that we expect will occur from the integration of these two great companies into a more efficient, larger-scale gaming entertainment platform.  We are also pleased that Boyd Gaming will be acquiring our Ameristar properties in St. Charles and Kansas City, along with Belterra Casino Resort and Belterra Park.  We look forward to working closely with Penn National and Boyd to seamlessly transition the Pinnacle businesses to their respective new owners."

**Compelling Strategic and Financial Benefits**

- **Increased Scale and Broader Geographic Diversification:** The acquisition will further establish Penn National as North America's leading regional gaming operator, benefitting from a broader, deeper base of properties, greater economies of scale and increased purchasing power. The combined company will operate 41 properties across 20 jurisdictions with approximately 53,500 slots, 1,300 tables and 8,300 hotel rooms, and will have more than 35,000 employees. In addition, by combining two of the top customer loyalty programs in the industry, Penn National will be better positioned to drive play within its portfolio, in particular at Tropicana Las Vegas and M Resort.

- **Creates Opportunity for Meaningful Synergies:** Penn National has identified $100 million in annual run-rate cost synergies driven by the elimination of corporate overhead redundancies and improved property level efficiencies, with limited incremental costs required to scale operations and integrate Pinnacle's properties.

- **Enhances Innovative Growth Strategy:** The acquisition will leverage Penn National's portfolio of regional and destination gaming properties and social gaming platforms across Pinnacle's portfolio of complementary assets. The combined company will benefit from additional promotional opportunities in online and social gaming, which will help provide an additional boost to property level performance.

- **Immediately Accretive to Free Cash Flow:** Penn National expects the acquisition of Pinnacle to be immediately accretive to free cash flow per share in the first year. The strong free cash flow generation from the combined companies will enhance Penn National's ability to de-lever its balance sheet, pursue strategic opportunities and ultimately return capital to shareholders.

**Divestitures**

In connection with the transaction, Penn National has entered into a definitive agreement with Boyd in which Boyd will purchase Pinnacle's gaming operations at Ameristar Kansas City and Ameristar St. Charles in Missouri; Belterra Casino Resort in Indiana; and Belterra Park in Ohio, for approximately $575 million in cash. These divestitures are anticipated to occur immediately prior to, and are conditioned upon, the completion of the Pinnacle acquisition.

**Definitive Agreements and Master Lease Amendments with Gaming and Leisure Properties**

Gaming and Leisure Properties (NASDAQ: GLPI) ("GLPI"), the landlord for Penn National and Pinnacle under their respective master lease agreements, has entered into an agreement to amend the terms of the Pinnacle master lease to

permit the divestitures.  In connection with the transaction, Penn National, GLPI and Boyd have agreed to the following:

- Penn National and GLPI will enter into a sale and leaseback of the real estate associated with Belterra Park and Plainridge Park Casino for approximately $315 million.

- An amendment to the terms of the Pinnacle master lease following closing of the merger to reflect an annual fixed rent payment of $25 million for Plainridge Park Casino and $13.9 million in incremental annual rent to adjust to market conditions.

- At closing, GLPI and Boyd will enter into a master lease agreement for the divestitures pursuant to which Boyd will lease the divested real property from GLPI (including the real property underlying Belterra Park).

- Penn National will assume the existing master lease and Pinnacle's existing lease for the Meadows Casino and Racetrack in Pennsylvania. Penn National's master lease with GLPI will not be affected by this transaction.

**Insiders' Interests in the Proposed Transaction**

46.      Pinnacle insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and Pinnacle's public stockholders.

47.      Company insiders stand to reap substantial financial benefits for securing the deal with Penn, as they will immediately gain liquidity for their otherwise illiquid shares and options. Pursuant to the Merger Agreement, Company restricted stock units (including phantom stock units, restricted stock units, other stock units, performance share grants, director other stock units, deferred shares under the Pinnacle's Directors Deferred Compensation Plan and any other similar instruments) and each share of restricted stock of Pinnacle common stock that have been awarded to Pinnacle's executive officers and directors will immediately vest and be converted into the right to receive cash payments.  The following table summarizes the cash payments the

executive officers stand to receive in connection with their vested and unvested equity awards in connection with the Proposed Transaction, totaling over $118 million:

| Name | Value of Pinnacle Options ($) | Value of Pinnacle Vested RSUs ($) | Value of Pinnacle Unvested RSUs (#) | Value of Pinnacle Restricted Shares ($) | Total Value of Outstanding Equity Awards ($) |
|---|---|---|---|---|---|
| **Executive Officers** | | | | | |
| Anthony M. Sanfilippo | $42,484,362 | — | $3,904,115 | $14,839,338 | $61,227,815 |
| Carlos A. Ruisanchez | $9,648,194 | — | $1,755,966 | $6,762,944 | $18,167,104 |
| Virginia E. Shanks | $6,153,104 | — | $1,303,271 | $5,047,034 | $12,503,409 |
| Donna S. Negrotto | $374,706 | — | $389,219 | $2,010,229 | $2,774,154 |
| Neil E. Walkoff | $4,161,533 | — | $714,271 | $2,906,790 | $7,782,594 |
| Troy A. Stremming | $2,595,204 | — | $547,265 | $1,792,496 | $4,934,965 |
| **Non-employee Directors** | | | | | |
| Charles L. Atwood | — | $658,042 | — | — | $658,042 |
| Stephen C. Comer | 994,640 | $2,880,636 | — | — | 3,875,276 |
| Ron Huberman | — | 0 | — | — | 0 |
| James L. Martineau | $994,640 | $2,026,535 | — | — | $3,021,175 |
| Desiree G. Rogers | $597,300 | $1,136,232 | — | — | $1,733,532 |
| Jaynie Miller Studenmund | — | $1,918,096 | — | — | $1,918,096 |

48.     Moreover, if they are terminated in connection with the Proposed Transaction, Pinnacle's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, totaling over $20 million.  Defendant Sanfilippo alone stands to receive almost $8 million in severance benefits if he is not retained after consummation of the Proposed Transaction.  The following table sets forth the golden parachute compensation the Company's named executive officers stand to receive:

| Name | Potential Cash Severance ($) | Prerequisites/ Benefits($) | Total ($) |
|---|---|---|---|
| Anthony M. Sanfilippo | $7,800,000 | $34,869 | $7,834,869 |
| Carlos A. Ruisanchez | $3,800,000 | $39,073 | $3,839,073 |
| Virginia E. Shanks | $2,800,000 | $30,204 | $2,830,204 |
| Neil E. Walkoff | $2,300,000 | $38,417 | $2,338,417 |
| Donna S. Negrotto | $1,764,000 | $14,492 | $1,778,492 |
| Troy Stremming | $1,710,000 | $39,232 | $1,749,232 |

49.     Therefore, while Pinnacle's public stockholders will lose control of the Company for an unfair price, certain Company insiders will receive substantial financial benefits if the Proposed Transaction is consummated.

**The Proxy Statement Contains Material Misstatements or Omissions**

50.     On February 28, 2018, Penn filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Pinnacle's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting or appraisal decision on the Proposed Transaction.  Defendants were obligated to ensure that the Proxy Statement did not contain any material misrepresentations or omissions.  Defendants breached this obligation.

51.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) both Pinnacle and Penn's financial projections, relied upon by Pinnacle's financial advisor, J.P. Morgan; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; (iii) Pinnacle insiders' potential conflicts of interest; and (iv) the background process leading to the Proposed Transaction. Accordingly, Pinnacle stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Financial Forecasts and J.P. Morgan's Financial Analyses***

52.     The Proxy Statement says that J.P. Morgan "reviewed certain internal financial analyses and forecasts prepared by the management of Pinnacle and certain internal financial analyses and forecasts for Penn prepared by Penn management and provided to Pinnacle management, which were subsequently adjusted and approved by Pinnacle management. . . ." Proxy Statement at 107.  However, the Proxy Statement fails to disclose or misrepresents material information relating to both Penn and Pinnacle's financial forecasts that were relied upon by J.P. Morgan for its analyses.

53.     The Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics in connection with Penn and Pinnacle's financial

forecasts. When a company discloses non-GAAP financial measures that were relied on by a board of directors to recommend that stockholders vote in favor of a proposed transaction, the company must also disclose all information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metric disclosed with the most comparable financial measure or measures calculated and presented in accordance with GAAP.

54. Specifically, for both Penn and Pinnacle, the forecasts contain values for: (i) EBITAR; (ii) EBITDA; and (iii) Unlevered Free Cash Flows ("UFCF"). In addition, the Pinnacle forecasts also include values for (i) Recurring EBITDAR; (ii) Recurring Free Cash Flow; and (iii) Free Cash Flow.

55. For purposes of the Penn forecasts, EBITDAR is defined as:

> earnings before interest income and expense, income taxes, depreciation, amortization, rent expense associated with the Meadows lease (as applicable), pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security investments, income (loss) from equity method investments, non-controlling interest and discontinued operations.

Proxy Statement at 94.

56. For purposes of the Pinnacle forecasts, EBITDAR is defined as:

> earnings before interest income and expense, income taxes, depreciation, amortization, rent expense associated with the Meadows lease, pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security investments, income (loss) from equity method investments, non-controlling interest and discontinued operations.

*Id*. at 96.

57. For purposes of the Pinnacle forecasts, Recurring EBITDAR is defined as:

> earnings before interest income and expense, income taxes, depreciation, amortization, rent expense associated with the Meadows lease, pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security

investments, income (loss) from equity method investments, non-controlling interest and discontinued operations.

*Id*. at 97.

58.     As the Proxy Statement states in connection with both the Penn and Pinnacle forecasts:

> EBITDAR is a non-GAAP financial measure and should not be considered as an alternative to operating income or net income as a measure of operating performance or as an alternative to any other measure provided in accordance with GAAP.

*Id*. at 94, 96- 98.  Despite this warning, the other metrics in both the Penn and Pinnacle forecasts are defined based on EBITDAR.  *See id.*  The Proxy Statement fails to disclose the line items used to calculate these non-GAAP metrics, nor does it provide a reconciliation of these non-GAAP metrics to the most comparable GAAP equivalent.

59.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.  Moreover, when a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

60.     As noted, J.P. Morgan relied on Company management's projections in connection with its financial analyses and fairness opinion.  In preparing its *Discounted Cash Flow Analysis*, J.P. Morgan utilized the non-GAAP UFCFs.  The Proxy Statement fails to disclose the line items utilized to calculate UFCFs and fails to provide a reconciliation to the most comparable GAAP equivalent.

61.     Without such undisclosed information, Pinnacle stockholders cannot evaluate for themselves whether the financial analyses performed by J.P. Morgan were based on reliable

inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required to ensure that stockholders can fully evaluate the extent to which J.P. Morgan's opinion and analyses should factor into their voting decision with respect to the Proposed Transaction.

***Material Omissions Concerning J.P. Morgan's Financial Analyses***

62.     The Proxy Statement describes J.P. Morgan's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Pinnacle's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in making their voting or appraisal decision with respect to the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Pinnacle's stockholders.

63.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement sets forth:

> J.P. Morgan calculated the unlevered free cash flows that Pinnacle is expected to generate during fiscal years 2017 through 2021, which were based upon financial projections prepared by the management of Pinnacle and upon extrapolations reviewed and approved by the management of Pinnacle for the fiscal years 2022 through 2026 under both existing tax rates and as adjusted for a reduction in Federal tax rates to 21% under then-proposed legislation.

Proxy Statement at 109. Yet, the Proxy Statement fails to disclose the unlevered free cash flows that Pinnacle is expected to generate for fiscal years 2017 through 2026 as adjusted for a reduction in federal tax rates to 21%. The Proxy Statement further fails to disclose the quantification of the inputs and the assumptions underlying the discount rate ranges of 8.25% to 9.25% and 8.50% and 9.50% utilized by J.P. Morgan in the analysis.

64.     With respect to J.P. Morgan's *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each transaction analyzed by J.P. Morgan.

65.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

***Material Omissions Concerning Pinnacle Insiders' Potential Conflicts of Interest***

66.     The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Pinnacle insiders.

67.     The Proxy Statement sets forth, "[u]pon completion of the merger, the current directors and executive officers of Penn are expected to continue in their current positions, other than as may be publicly announced by Penn in the normal course."  Proxy Statement at 124. However, according to the December 18, 2017 press release announcing the Proposed Transaction, Timothy J. Wilmott, Penn's CEO, stated, "[w]e look forward to welcoming Pinnacle's talented employees to our team and to further enhancing our status as North America's leading regional gaming operator."  Yet, the Proxy Statement fails to disclose the details of any employment related discussions and negotiations that occurred between Penn and Pinnacle executive officers, including who participated in all such communications, when they occurred, and their content, as well as whether any of Pinnacle's prior proposals or indications of interest mentioned management retention.

68.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations

that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

69.     The Proxy Statement also fails to disclose or misstates material information relating to the background process leading up to the Proposed Transaction, including:

(a)     The questions Pinnacle had posed in response to Penn's proposal on March 15, 2017 of $23.00 per share in cash;

(b)     The other opportunities Pinnacle was exploring that defendant Sanfilippo referenced on May 31, 2017, and the strategic alternatives the Board discussed at its June 1, 2017 meeting;

(c)     Whether the October 5, 2017 article in *The Wall Street Journal* about merger rumors involving Pinnacle and Penn affected negotiations;

(d)     Details regarding a "strategic buy-side opportunity being considered by Pinnacle" that was discussed at the October 29, 2017 Board meeting; and

(e)     Why Pinnacle waited until December 11, 2017, just 6 days before it voted to approve the Merger Agreement, to retain J.P. Morgan in connection with the Proposed Transaction.

70.     Defendants' failure to provide Pinnacle stockholders with the foregoing material information renders the statements in the "Background of the Merger," "Recommendation of the Pinnacle Board and Reasons for the Merger," "Opinion of Pinnacle's Financial Advisor," "Certain Pinnacle Unaudited Prospective Financial Information," "Interests of Certain Pinnacle Directors and Executive Officers in the Merger" and "Board of Directors and Management of Penn Following Completion of the Merger" sections of the Proxy Statement false and/or materially misleading and constitutes a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to

disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision on the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

### CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and Regulation G Promulgated Thereunder**

71.     Plaintiff repeats all previous allegations as if set forth in full.

72.     During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 and Regulation G promulgated thereunder.

73.     By virtue of their positions within the Company, Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the sales process for the Company, the financial analyses performed by the Company's financial advisor, and the actual intrinsic standalone value of the Company.  Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

74.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

75.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 and Regulation G promulgated thereunder.

76.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of
Section 20(a) of the Exchange Act**

77.     Plaintiff repeats all previous allegations as if set forth in full.

78.     The Individual Defendants acted as controlling persons of Pinnacle within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Pinnacle, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

79.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

81.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

82.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9 and Regulation G, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Pinnacle's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class, and against Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Pinnacle stockholders;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 and Regulation G promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  March 2, 2018                                    **MUCKLEROY LUNT**

                                              By   */s/ Martin A. Muckleroy*
                                                   Martin A. Muckleroy
                                                   6077 S. Fort Apache Rd., Ste 140
                                                   Las Vegas, NV 89148
                                                   Telephone: (702) 907-0097
                                                   Fax: (702) 938-4065
                                                   Email: martin@muckleroylunt.com

                                                   *Attorneys for Plaintiff*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506
Email:  fortunato@bespc.com

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
Alexandra E. Eisig
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010